# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JEFFREY PETERSEN,<br>*Plaintiff,* | : | CIVIL ACTION NO. |
| V. | : | |
| THE UNITED STATES OF AMERICA,<br>*Defendant.* | : | JANUARY 19, 2018 |

## COMPLAINT

### INTRODUCTION

The plaintiff, Jeffrey Petersen brings this action against the United States Government pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346 et al., to recover money damages for the severe personal injuries he suffered as result of the negligence of Monte Wagner and the Community Health Center, Inc., located in Danbury, Connecticut, and /or their servants, agents, apparent agents and/or employees.

### JURISDICTION AND VENUE

1. This court has jurisdiction over plaintiff's' claims against the United States pursuant to 28 U.S.C. § 1346(b)(1).

2. The amount in controversy far exceeds $75,000.00, exclusive of interest and costs.

3. Venue is proper pursuant to 28 U.S.C. § 1402(b) because the plaintiff resides in Connecticut and the negligence of the defendant occurred in Connecticut.

## PARTIES

4. The plaintiff, Jeffrey Petersen is a citizen of the State of Connecticut.

5. At all times mentioned herein, Community Health Center, Inc., operated a federally funded Community Health Center in Danbury, Connecticut, known as the Community Health Center of Danbury, located at 8 Delay St., Danbury, Connecticut.

6. At all times mention herein, Monte Wagner, an Advanced Practice Registered Nurse ("APRN"), was a servant, agent, apparent agent and/or employee of Community Health Center, Inc., located in Danbury, Connecticut.

7. The Community Health Center, Inc., located in Danbury, Connecticut, and its servants, agents, apparent agents and/or employees, including Monte Wagner, (hereinafter collectively referred to as "The Community Health Center"), are deemed to be employees of the United States government by the Health Resources and Services Administration and the Bureau of Primary Health Care, in accordance with § 224(g) of the Public Health Service Act, 42 U.S.C. § 233(g) as amended by the Federally Supported Health Centers Assistance Act of 1995 (P.L. 104-73), for purposes of the FTCA.

## LIABILITY

8. At all relevant times herein, commencing on or about March 3, 2014, the United States, through the Community Health Center, undertook the care, treatment, monitoring, diagnosing and supervision of the plaintiff, Jeffrey Petersen, including the ordering of "Diagnostic Imaging: ultrasound guided biopsy submandibular glands" for "Lymphadenitis NOS."

9. On or about March 19, 2014, Dr. Francis Flaherty interpreted and reported an "US Head/Neck Soft Tissue," including therein the following finding: "There is a 2.7 x. 2.4 x 2.1 cm hypoechoic solid mildly vascular mass within the upper right neck adjacent to the submandibular gland. The lesion is indeterminate in nature;" and impression: "Indeterminate solid 2.7 cm hypoechoic mildly vascular mass within upper right neck. Neoplasm should be excluded. Contrast CT or MRI could be performed if warranted to further assess."

10. On or about February 24, 2015, Jeffrey Petersen next returned to the Community Health Center, Inc.

11. Shortly following February 24, 2015, the Community Health Center first informed Jeffrey Petersen of the results of the March 19, 2014 ultrasound.

12. On or about March 20, 2015, Jeffrey Petersen underwent a CT scan of his neck; the impression on the report of said scan included the following: "There are numerous solid round nodules in the visualized portion of the bilateral upper lungs. These finding are suspicious for metastatic disease…" An addendum to this report included the following: "Upon further review, there is a 2.6 x 3.3 x 3.1 cm circumscribed area within the inferior aspect of the superficial lobe of the right parotid gland which likely corresponds with the finding on prior ultrasound dated 3/19/2014. Given the findings within the lungs, this finding is again concerning for metastatic disease…."

13. While under the care, treatment, monitoring, diagnosing, and supervision of Community Health Center, Jeffrey Petersen suffered severe, serious, painful, and permanent injuries as hereinafter set forth in paragraph 15.

14. The said injuries of Jeffrey Petersen were caused by the failure of Community Health Center to exercise reasonable care under all of the facts and circumstances then and there existing in that it:

   a. failed to adequately and properly care for, treat, diagnose, monitor and supervise Jeffrey Petersen's medical condition;

   b. failed to properly follow up on Jeffrey Petersen's medical condition;

   c. failed to properly follow up on the testing ordered by Monte Wagner on or about March 3, 2014;

   d. failed to properly obtain the results of the testing ordered by Monte Wagner on or about March 3, 2014;

   e. failed to properly obtain the results of the March 19, 2014 ultrasound;

   f. failed to properly communicate the results of the findings/interpretation of the March 19, 2014 ultrasound to Jeffrey Petersen;

   g. failed to promulgate and/or enforce rules, regulations, standards and protocols for the proper care and treatment of patients such as Jeffrey Petersen;

   h. failed to provide health care professionals who possess the requisite knowledge, skill and experience to adequately and properly care for, treat, diagnose, monitor and supervise Jeffrey Petersen's medical condition.

15. As a result of the carelessness and negligence of the United States, by and through its servants, agents, apparent agents and/or employees, Jeffrey Petersen suffered the following severe, serious, painful, and permanent injuries:

   a. a delay in the diagnosis of adenocystic carcinoma of the parotid gland;

   b. a delay in diagnosis of adenocystic carcinoma causing metastasis to the lung;

   c. delay in treatment for cancer;

   d. right parotidectomy with the loss of multiple braches of nerves;

   e. loss of hearing;

    f.    numbness;

    g.    facial droop or paralysis;

    h.    neuropraxia;

    i.    7th nerve dysfunction;

    j.    Stage IV B adenocystic cancer;

    k.    exacerbation and metastasis to a Stage IV B cancer;

    l.    side effects from Paxil and Carboplatin;

    m.    radiation mucositis;

    n.    gastrostomy tube placement;

    o.    nutrition via gastrostomy tube;

    p.    constipation;

    q.    multiple hospitalizations;

    r.    multiple procedures;

    s.    dehydration;

    t.    pain;

    u.    suffering;

    v.    psychological, physiological and neurological sequelae.

16. As a further result of his injuries, Jeffrey Petersen has been permanently deprived of his ability to carry on and enjoy life's activities and his earning capacity has been permanently destroyed.

17. As a further result of his injuries, Jeffrey Petersen has incurred expenses for medical care and treatment all to his financial loss.

## PRAYER FOR RELIEF

**WHEREFORE,** the plaintiff prays for relief as follows:

1. Damages in the amount of $15,000,000.00, or such other amount that the court deems just and proper;

2. Such other and further relief as the Court might deem appropriate.

                                **THE PLAINTIFF,**

BY: _____
            CAREY B. REILLY ct02689
            KOSKOFF, KOSKOFF & BIEDER, P.C.
            350 FAIRFIELD AVENUE, 5TH FL.
            BRIDGEPORT, CT 06604
            TEL NO.: 203-336-4421
            FAX NO.: 203-368-3244
            creilly@koskoff.com

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JEFFREY PETERSEN,<br>  *Plaintiff,* | : | CIVIL ACTION NO. |
| V. | : | |
| THE UNITED STATES OF AMERICA,<br>  *Defendant,* | : | JANUARY 19, 2018 |

### CERTIFICATE OF GOOD FAITH

I, CAREY B. REILLY, hereby certify that I have made reasonable inquiry, as permitted by the circumstances, to determine whether there are grounds for a good faith belief that there has been negligence in the care and treatment of JEFFREY PETERSEN. This inquiry has given rise to a good faith belief on my part that grounds exist for an action against the defendants, COMMUNITY HEALTH CENTER, INC., and/or its servants, agents, apparent agents and/or employees, including but not limited to: Monte Wager.

THE PLAINTIFF,

BY:_____
CAREY B. REILLY ct02689
KOSKOFF, KOSKOFF & BIEDER, PC
350 FAIRFIELD AVENUE
BRIDGEPORT, CONNECTICUT 06604
TEL NO.: 203-336-4421
FAX NO.: 203-368-3244
creilly@koskoff.com

# HEALTHCARE OPINION
# PURSUANT TO C.G.S., SECTION 52-190a

## [NOT SUBJECT TO GENERAL DISCLOSURE]

Dear Attorney Reilly:

      Thank you for asking me to review the case of Jeffrey Petersen. Since 1999, I have been a certified and licensed Advanced Practice Registered Nurse ("APRN") in the specialty area of practice of Family Medicine. Prior to that, in 1972, I became a registered nurse licensed to practice by the Connecticut Department of Public Health.

      I am familiar with the standards of care in 2014-2015 applicable to Monte Wagner, an APRN who also has the specialty area of practice of Family Medicine, insofar as he rendered family healthcare to Mr. Petersen at the Community Health Center, Inc., ("CHC").

      I have reviewed the following materials:
- Jeffrey Petersen's medical records from Community Health Center, Inc. dated 3/3/14, 2/24/15, 3/2715, 3/31/15 and 4/20/15;
- US of the Head/Neck report dated 3/19/14;
- CT Scan of the Neck report dated 3/20/15, with addendum dated 3/31/15;
- CT Chest report dated 4/7/15;
- Lab report dated 4/20/15;
- Letter dated 4/20/15 from Vincent Rella, M.D., to Monte Wagner;
- Monte Wagner's deposition transcript dated 10/17/17.

      As I understand the facts herein, on March 3, 2014, Mr. Petersen was seen and evaluated by Monte Wagner, APRN, at CHC in Danbury, CT, for "R jaw hard lump, painless." On clinical exam, Monte Wagner, an APRN employed by CHC, noted "Neck: supple, no lymphadenopathy, except single hard non-tender submandibular lymph node to R side." Mr. Wagner diagnosed "Lymphadenitis NOS" and ordered further assessment of the mass by way of an ultrasound and an "ultrasound guided biopsy submandibular glands." Mr. Wagner concluded his note with a recommendation for a two week follow up after the ultrasound procedure to address the results. No follow up was scheduled.

      On March 19, 2014, Mr. Petersen underwent an ultrasound of the head and neck by Dr. Francis Flaherty of Danbury Radiology Associates, PC. No biopsy was performed. The ultrasound report states, among other things, "IMPRESSION: Indeterminate solid 2.7 cm hypoechoic mildly vascular mass within upper right neck. Neoplasm should be excluded. Contrast CT or MRI could be performed it warranted to further assess."

      Mr. Petersen was seen next by Mr. Wagner at the CHC on February 24, 2015, nearly one year later. The treatment notes of that office visit do not even address the neck mass issue.

1

Further, the treatment notes of February 24, 2015, do not address the results of the March 19, 2014 ultrasound.

Mr. Wagner testified in his deposition taken on October 17, 2017, that at or about 3:48 pm on February 24, 2015, after his visit with Mr. Petersen, Mr. Wagner faxed Danbury Hospital requesting a report from the March 19, 2014 ultrasound. On the same date, at or about 6:21 pm, Danbury Hospital Medical Records sent to the CHC, attention Mr. Wagner, the ultrasound report for the March 19, 2014 study. Upon his receipt of the report of the ultrasound, Mr. Wagner followed the recommendation of the radiologist and ordered a CT scan of the neck with contrast. This test was performed on March 20, 2015. The initial report did not address the nodule in the right jaw but did report solid round nodules in the bilateral upper lungs. An addendum further stated: "Upon further review, there is a 2.6 x 3.3 x 3.1 cm circumscribed area within the inferior aspect of the superficial lobe of the right parotid gland which likely corresponds with the finding on prior ultrasound dated 3/19/14. Given the findings within the lungs, this finding is again concerning for metastatic disease." On March 27, 2015, Mr. Wagner met with Mr. Petersen to follow up on the results of the recent scan.

The standard of care applicable to Monte Wagner, an APRN employed by CHC, required him, among other things, to follow up with Danbury Hospital, Danbury Radiology Associates, Mr. Petersen, and others, within a reasonable time following Mr. Petersen's March 19, 2014 ultrasound of his head/neck. There is no evidence that Monte Wagner and/or CHC ever followed up on the March 19, 2014 ultrasound until February 24, 2015, almost one year later. It was the responsibility of Monte Wagner and/or CHC to have in place a proper procedure for following up on diagnostic procedures performed outside of their facility. Monte Wagner and/or CHC failed to follow-up in a timely manner as set forth herein and thereby departed from the accepted standard of care.

Based upon my review of the records provided, it is my opinion that there is evidence of medical negligence on the part of Community Health Center. The opinion stated herein is based upon the information available to me at this time. Should other information and evidence become available, I reserve the right to supplement and/or amend this opinion.